We have two cases for argument today, and the first one is Energy S.A. Combined Cycle Power et al., 21-1510 and 21-1752. We'll hear first from Mr. Levy, who has reserved two questions. Mr. Levy? Thank you. May it please the Court, and good afternoon, Your Honors. We filed this suit here because GE and its witnesses and evidence are here, and the FSIA provides jurisdiction over Angola. The Court below dismissed the case for form nonconvenience, and that was legal error for multiple reasons. Today, I plan to focus on a few points. First, the more convenient for GE. Second, the FSIA makes form nonconvenience unavailable for Angola or materially changes the analysis. Third, and regardless, the Court fundamentally misapplied the ordinary framework at each step of the Irigaray framework, violating multiple published decisions of the Court. And there, I intend to focus on two points. First, that Angolan and second, that the Court below erred by never analyzing whether Angola is significantly preferable, despite the clear instructions of the Court in Irigaray and overseas. Mr. Levy, can I ask you what I hope is a short question? Did you preserve the argument in the district court that the FSIA does not, I'm sorry, that the FNC is categorically unavailable in foreign sovereign immunity cases? And in that regard, I would direct your attention to your opposition footnote 50 on page 51, where your side stated, plaintiffs recognize that the Second Circuit has applied form nonconvenience in FSIA cases and assert here that the FSIA's jurisdiction evidences the national interest. At the same time, they submit solely for preservation purposes that the doctrine should not apply at all in FSIA. As I read that, had I been in the district court, I would have assumed that you were saying that you thought you were bound by Second Circuit precedent on that point and that you were preserving it, I don't know, maybe for Can you tell me, do you think Judge Cronin thought that argument was in play? I think Judge Cronin certainly should have known that we made the argument that the FSIA should be considered. We made that in the text. As to the more specific question, I understand your argument that there are interests in play, but at least for the threshold question that it is categorically barred. I frankly don't see how you preserve that. I think it's preserved, and we cite an 11th Circuit case that has specifically addressed this circumstance where there is decisions from the circuit that purport to speak on the question, which we think would have been binding on Judge Cronin, but are not binding on this panel because they are drive-by jurisdictional rulings. Why would they be binding on Judge Cronin if they're not binding on us? Aren't the district court and we in pari materia with respect to being bound or not bound by prior precedents because maybe what's said is dictum or is not truly binding on anyone, but if it is binding on anyone, why isn't it binding on us as much as on the district court? I think there are two different issues at stake as to a panel of this court principles of star decisis would apply, and so the Supreme Court does not consider itself bound by a prior jurisdictional ruling, for but the issue of whether Judge Cronin was bound is an issue of judicial hierarchy, which raises altogether different points. I will add that because the issue raises subject matter jurisdiction, we think it's open to this court to address in the first instance, it's a pure legal issue, and it's fairly encompassed in the broader question of- I'm sorry, it's conceded that there's subject matter jurisdiction. That's not the issue. The issue is whether the forum non-convenience doctrine applies. That's not a jurisdictional doctrine. The question whether a district court has the authority to dismiss or has the unflagging obligation to proceed is a jurisdictional question we think implicates those concerns. Our arguments to that in that regard are set forth in the brief. Well, wouldn't that mean that every forum non-convenience decision is jurisdictional and any objection to forum non-convenience can be raised sua sponte even by the Court of Appeals? I don't think so, Your Honor, because what we're saying here is- Excuse me. I mean, forum non-convenience is an exception or one of the exceptions to the unflagging obligation to exercise jurisdiction if you have it. So if that is enough to transform the issue into one of jurisdiction, wouldn't that apply to every case of forum non-convenience? No, Your Honor. The point we make is that the FSIA, which is a jurisdictional statute, bars application of the doctrine. That is a jurisdictional question. Whether FNC has been appropriately applied in an ordinary case is not a jurisdictional question, and for that reason, they are different. Okay. I'm sorry. Go ahead. Aren't you invoking a line of cases where we say that, look, even if subject matter jurisdiction wasn't raised below, we have the power and indeed the obligation to verify that we have subject matter jurisdiction. Those are cases when we thought we might lack subject matter jurisdiction. I have to say, I don't think I've ever encountered a situation where someone argued that subject matter jurisdiction existed in a way that obliged us to exercise our jurisdiction, and a failure to consider that issue below could be ignored by us. So am I missing something? Did you cite a case for that contrary situation that I just outlined? I'm not sure we cited a case to that effect. We do think the principle of the CSX case, which applies here, we recognized that there was these decisions of this court and flagged the issue for preservation purposes. We think that's enough. What does preservation purposes mean? Preserve for whom? It sounds like you're skipping over the district judge and waiting to come to us, but that's not how we proceed. As we understood it, because there were these pronouncements by this court, the district judge could not address those questions as a matter of hierarchy. We think it's certainly open to the court and bank to readdress the question, and we think as a matter of stare decisis, a panel of this court can reexamine these questions, which were addressed in passing without analysis, without ever being briefed. Indeed, in the ProSyphon case, for example, the state just argued that wanted to have this court address in the first instance its form nonconvenience argument in the alternative. This court left it open on remand. It just was never addressed. So that's why we think it's preserved. So if I may, Your Honor, on the merits. On the first point, we think it was a legal error to dismiss the case as to GE, despite finding this form convenient for GE. GE and its witnesses are here. Its evidence is here. The court said not once but twice that it is more convenient for GE. Well, Mr. Levy, isn't the question whether the form is convenient globally for the resolution of this case, not whether it happens to be convenient for one or another party, even a defendant? Right. I think the point is when there's that is the global question, although the Olympic case versus Société Générale does look at it party by party. And the fact that it is convenient for GE here does affect the analysis in a way that should have been considered and was well. Well, affect the analysis is no question. It affects the analysis. And the court factored it into its analysis by saying that, yeah, it's not such a burden on GE and then goes on to consider all the other factors. But you're making the argument that it is preclusive, that this case must be here, I think, by a sort of two step process. Number one, because GE shouldn't be allowed to bring a forum nonconvenience motion. And then once that's settled, you sort of bootstrap in Angola by saying, well, it would be really inconvenient to split it up after you just split it up by saying we're going to consider GE first and not Angola. Why not consider Angola first and decide it's really inconvenient for them and then say it's really inconvenient to the whole thing should be dismissed? What privilege is the one over the other? The reason for that rule arises from who bears the burden of proof and the fact that it is the defendants who bear the burden of proof to show that the form is inconvenient for the litigation. So that's the rationale. Yes, for the litigation, for the litigation, not necessarily for that particular litigant. A case might be very difficult to litigate in the home forum of one of the parties. Isn't that a possibility? Right. I think, first of all, as to Angola, the form is unavailable because of the non-waivable statute of limitations. So if you have a situation here where the case is more convenient for GE here and there's a non-waivable statute of limitations as to Angola, and I see that my time is up. I don't know if I can go ahead. Thank you. So we have a situation here where there are two defendant groups, one of whom, for one of whom it is more convenient to be here. And for the other, there's no adequate remedy in Angola by virtue of this non-waivable statute of limitations. The additional wrinkle to all this, and I'm moving a bit around in the order of my presentation, is that when the court did evaluate the litigation as a whole, it never considered the key questions of what precise issues might actually be disputed, and isn't Angola, in fact, superior? Significantly preferable. Those are the words of the, that is the standard under Irigaray and Biggio, and the court has made clear multiple times, including in the overseas case, that if there's only consideration of the inconvenience of this forum and not of the And that clearly happened here, as is made clear by multiple parts of the analysis, where not only did the court find this form more convenient for GE, but it went on to say that there are missing witnesses here, without analyzing whether there are missing witnesses there, that there are translation issues here, but never analyzing whether there are translation issues there. Well, but it did list, I mean, it did list various advantages to Angola, right? I mean, you're contesting that, for example, the presence of various witnesses in Angola, like government officials, like the existence of key contracts in Portuguese, right? So it did list, you say they have to, the district court has to explain the preferability of the alternative forum. Aren't those factors that the district court did enumerate as advantages to Angola? Now, you may dispute whether those advantages outweigh the others, but those are advantages it listed, correct? It listed some advantages it never undertook the required analysis, and that's made particularly clear with respect to its treatment of Mr. da Costa and Mr. Nelson, who are two key witnesses, the only two key witnesses that the defendants below claimed were essential. The court treated, relegated them to a footnote. Well, nobody knows where they are, right? Well, that's not true. One of them is the, everybody agrees is in Ghana, and we submitted evidence that he has a U.S. passport, but if I may, I'd like to focus. Aren't they neutral? They're neither in the United States nor Angola, so they're simply neutral issues that you can go to Angola, you can go to the United States, and it doesn't matter for them, right? I mean, a U.S. passport doesn't mean you're going to get the witness in the U.S., right? If they're in another country, how do you call their attendance? So, that's not right. There is a statute that permits attendance of U.S. citizens and residents, and the district court below in that footnote said, number one, I'm not going to address the issue because it was raised after argument. Even though the court asked for briefing on the issue, that was a violation of this court's instruction in the Sony case. It then said, it's not clear whether they are residents or citizens. That flipped the burden of proof. We had provided a copy of Mr. Nelson's U.S. passport and records showing that Mr. DaCosta had voted. And the third point the court said is, well, it doesn't really matter if they're here or not because presumably other witnesses are missing here. The question should have been in light of the court's instructions and the fact that everybody agreed these were critical witnesses, are they available there? And that's the analysis that the court never undertook, and that showcases the error, which it's the example but it's repeated. Assuming you get past the FSIA and what we think is a clear error of failing to apply and consider the policy interests of the United States, assuming that the court applied the right standard as to the deference given to the plaintiff, assuming it found Angola available, and on all those points we think there was error. On the availability of Angola as a forum, there is a statute of limitations barring claims against Angola. In Angola, it is common ground and not disputed that that statute of limitations is not waivable. There is some dispute as to whether it applies. The court below assumed that it did. And as to that, said, well, it doesn't matter because there are other legal claims that we might have against Angola. That's wrong for multiple reasons. First, the statute of limitations bars the only procedure that is available for bringing suits against Angola. And second, even if it barred, so it's just wrong, it bars all claims against Angola. And even if it barred only contract claims, which is what the that would have left us with claims against GE, which are inadequate, given the court's clear instructions that jurisdiction must be established by the defendants as to all the defendants abroad. And second, the claims that were purportedly available against Angola, which we say are not, are of a different nature. And so they are not the same legal theory and they do not meet the test that the Supreme Court set forth in Piper. A contract claim is not like an international taking claim and they're different claims. I've given you plenty of extra time and I appreciate it. And we're going to hear more from you in due course, but let's hear from Mr. Dupree for GE. Thank you very much. Thank you, Your Honor. Tom Dupree on behalf of the GE defendants and may it please the court. This is an Angolan dispute that belongs in Angola. Both of the plaintiffs are Angolan corporations and the majority of defendants are sovereign arms of the Angolan government. The core issue in this dispute is whether the Angolan government violated Angolan law when it and seized plaintiff's property in Angola. Judge Cronin acted well within his broad discretion in dismissing this case under forum nonconvenience. His 43-page opinion carefully and correctly applies this court's well-settled three-factor test for forum nonconvenience. And we believe his judgment should be affirmed. Judge Cronin began by examining the level of And again, drawing on this court's precedent, he noted that both plaintiffs are foreign corporations, which per se entitles them from the start to a lower level of deference. He also determined as a matter of fact that the plaintiffs were forum shopping when they filed this case. As the court knows, the plaintiffs have been litigating the very same claims in Angola that they are now asking the Southern District of New York to adjudicate. Judge Cronin called him out on that. His opinion correctly said that this Southern District complaint smacks of forum shopping. On the second- Mr. Giffrey, excuse me. Can I maybe jump ahead a little bit to just a small question that's been bothering me? Judge Cronin dismissed this case, but with a proviso that it was dismissed if the defendants would stipulate not to raise in personam jurisdiction or the statute of limitations in Angola. And you folks did so stipulate, as I understand it. That is you, the defendants. Then there was this kerfuffle because the plaintiff wouldn't sign the stipulation. And then the district court, at least as I read, I think it could be read to just say, well, then the heck with it then, and revoke that proviso. And I guess what I'm wondering is, do you consider yourself bound by that obligation? Or do you think that you're free now to go back to Angola and raise in personam jurisdiction or raise the statute of limitations issue? Well, your honors, as a technical matter, I think we are free. And that is your honor correctly pointed out, the plaintiffs rejected the stipulation and refused to sign it. That said, we were willing to stipulate before, and certainly we wouldn't want a failure to stipulate on our part to, in any sense, undermine Judge Cronin's dismissal order. So as I said, we stipulated before, if that were an issue that concerned this court, I'm 100% confident we'd be willing to stipulate again. So you would have no objection to our reinstating that obligation on the part of defendants if we thought that were appropriate as Judge Cronin had? Absolutely, your honor. Yes, if this court felt that were a necessary condition for dismissal under form non-convenience, yes, we would so stipulate. I would just point out, your honor, that in our opinion, the statute of limitations argument really is a red herring. Our Angolan law expert attested that there is no statute of limitations problem. As Judge Cronin pointed out, even the plaintiff's own expert wouldn't go so far as to assert that their claims were actually barred by the statute of limitations. And of course, it's only one claim out of the 10 or so claims that they intend to bring. So we don't think it's necessary, but as I said, we certainly wouldn't want that minor issue, in any sense, to stand in the way of this court's affirming Judge Cronin's very sound opinion. If I could speak to the adequacy of the forum, your honor, I think here the analysis is exceedingly straightforward. This court applies a two-part standard. Number one, are the plaintiffs subject to jurisdiction in the alternative forum? Answer, yes, we have so stipulated. Number two, does the alternative forum provide a hearing? Will it entertain the claims that the plaintiffs are bringing? Here, too, uncontested, our expert Professor Vail marched through plaintiff's claims line by line and concluded that every single one, without exception, could be heard in Angola. In fact, many of them are being heard in Angola. And then during the hearing, Appendix 1160, plaintiff's counsel conceded on the record in the district court that they did not disagree in any sense with Professor Vail's conclusions. So again, I don't think there's any serious dispute that Angola is an adequate forum for this dispute. The final point, of course, is the one that is ultimately committed to the sound discretion of the district court. This court has said time and again that district courts have broad discretion. This court affords district courts wide latitude in weighing the forum non-factors and balancing the factors that the Supreme Court identified in Gilbert. Here, Judge Cronin did exactly that. He pointed out that the key witnesses in this case are in Angola. Judge Nardini, you asked about the whereabouts of Mr. DaCosta. He is an Angola citizen who is in Angola. I would refer your honor to page 828 of the appendix, where in the district court, we actually contacted Mr. DaCosta's lawyer and says, where is he? And their lawyer said, oh, the guy's here in Angola. Also, Confidential Appendix 61 reflects Mr. DaCosta's Angolan citizenship. So I don't think there's any dispute at this point that Mr. DaCosta is in Angola. And of course, there's no dispute that the vast bulk of the witnesses in this case, the Angolan president, the Angolan ministers, all of these Angolan government officials, just to name a few of the people that plaintiffs themselves have identified in their initial disclosure witness list, all of these individuals are in Angola. And it is their testimony that is going to be the key to this dispute. Bear in mind, the plaintiff's claims against... I'm sorry, your honor? At the risk of asking a rather broad and blunt question, all that you're saying just now, about who's available in Angola, raises the question in my mind, why exactly are your adversaries seeking to bring this lawsuit in New York? It must be precisely for the reasons you just indicated. They don't feel they're going to get a fair hearing, a fair process in Angola. What can you tell us about the Angolan system of justice, which would give us comfort, or should give anyone comfort? Absolutely, your honor. I would refer your honor to the declarations that we submitted from Professor Vail. They're in the record at Appendix 157, 1050, and Confidential Appendix 52. Three declarations from Professor Vail, who is a leading professor at a law school in Angola. It's basically the equivalent of Yale Law School in Angola. And she attested at length... That might cause us some concern. All right, let's just say a top law school in Angola. Now I'm really worried. She basically explained all of the procedures, how Angola affords due process, the plaintiffs have their day in court. And I would point out a couple of things. One, as I mentioned earlier, when Plaintiff's Council was confronted with Professor Vail's analysis and declarations in the district court, and Judge Croton put the question directly to my good friend, Mr. Levy, do you disagree with anything Professor Vail says? He said, on the record, no, not at all. In fact, their own Angolan law expert didn't argue that Angola was in inadequate form or didn't provide due process. Even their own expert wouldn't say any of that. And as I said, the plaintiffs are litigating these exact claims on multiple fronts in Angola. They've got one case going in the Angola Supreme Court. They've got another case that was pending in the Luanda Provincial Court. So they are getting their day in court and more in Angola. Supreme Luanda, I guess. Yes, the plaintiffs are fighting a multi-front battle because their goal is to get reinstated to business in Angola. And so when they say, well, we can't litigate in Angola, we don't want to go there. They are trying furiously to get their business reinstated in Angola. They've been trying for years. They're furiously litigating these exact same claims in Angola. So how would you describe, and I know that it's not for you to imagine the perspectives or the motivations of opposing of the opposition, but what do you think gives them pause? Why are they so hell-bent to have this adjudicated here in the United States? Well, that is a question maybe best addressed to Mr. Levy. From my perspective, I think it's two things. One is that, as Judge Cronin correctly found, it's a classic instance of forum shopping. They began this litigation campaign in Angola and they weren't meeting with the results they wanted. What I want to know is why are they forum shopping in Angola? This dispute, this concern on their part. They want another bite at the apple, and I suspect they viewed this as an opportunity to obtain some leverage against GE, against my client by opening a new front in the Southern District of New York. This is not their first trip to the Southern District. They were here a couple of years ago before Judge Cronin when they filed a 1783 action to get discovery from GE for use in their Angolan lawsuit. Two years ago, they were here litigating to gather up all the evidence for this great Angolan lawsuit they were going to bring, and which they did in fact bring. Now, a couple of years later, that lawsuit is not going as well as they liked, and as Judge Cronin found, it's a classic case of forum shopping. I thought everyone liked to be in the Southern District of New York because it's the mother court and all that. It's a great place to be. I can see in some cases, yes, in cases that involve Angolan parties, Angolan property, the law of Angola, Angolan witnesses, I would respectfully submit maybe it's not the best candidate to resolve this dispute. This court has said time and again that a critical element of the forum non-analysis is analyzing the local interests at play, whether there is a local interest in adjudicating a local dispute. I would submit it is hard to imagine a dispute that touches more closely on the sovereign interests of the nation of Angola than adjudicating whether its own president violated Angolan law when he allegedly breached these Angolan infrastructure contracts and seized plaintiffs' Angolan property. This case has nothing to do with New York or the United States, and for those reasons, Your Honor, we respectfully submit this court should affirm Judge Cronin. So you're suggesting, Mr. Dupree, that the great mistake made by Mr. Levy's clients was the failure to have contractual language placing litigation somewhere other than Angola. As if they had been concerned about Angola, they would do what is customarily done by arranging for arbitration under the New York Convention or whatever. That, Your Honor, is an excellent point. For one thing, the contracts at issue, the underlying contracts on which the plaintiffs are suing have venue selection provisions that say disputes will be resolved in Angola. And keep in mind, the plaintiffs themselves are Angolan corporations who are doing business in Angola. They agreed to resolve these disputes in Angola. And so then when things go wrong, they say, wait a minute, the Angolan courts actually aren't good enough for us. We need to litigate this in New York. If that was the tactic they wanted to do, as Your Honor correctly pointed out, the time to do that was to get contractual language to that effect decades ago. Thank you. Mr. Levy will address that issue when he gets up again, but we first have to hear from Mr. Ehrenstein from the Republic of Angola. Good afternoon. May it please the court. My name is Michael Ehrenstein, and I represent the appellee defendants, the Angolan defendants. We agree with everything that Mr. Dupree just so artfully argued with respect to foreign nonconvenience. But the Republic of Angola's position with foreign nonconvenience is actually even perhaps a little bit stronger than the positions that have been asserted by GE. We agree that this case has no connection to the United States and certainly not to New York. This case is about a breach of a contract between Angolan plaintiffs. They were formed in Angola for the purpose of doing business in Angola, who are suing Angolan defendants, the Angolan sovereign government. It over contracts that negotiated, executed, performed, and allegedly breached all in Angola. The subject of those contracts all dealt with power plants that were to be built in it or serviced in Angola. Maybe you could address a simple question of mine. What can you tell us about the legal system of what we can call American norms? Yes, Your Honor, certainly. I can tell you that we have any experts in the record other than those in Angola? Do we have anybody from, I don't know, Cornell Law School or whatever telling us what I know? No, no. Here's what we have. We have Professor Vail, who stated flat out and unequivocally that there's an independent judiciary and that it follows due process. There is due process. We have Professor Diamvatou, who, like Professor Vail, said there is due process, there are procedural safeguards in place, and an independent judiciary. That witness is also in Angola. They are both in Angola. That's correct. What we don't have is any testimony from any expert on behalf of the plaintiffs saying, oh, and by the way, Angola doesn't have due process, doesn't have procedural safeguards, doesn't have an independent judiciary, that they are really in inadequate form. Nobody has said that. Did your adversaries produce any evidence at all on the inadequacy of the legal system or the judicial system of Angola? The only thing that the plaintiffs were able to try to hang their hat on were two stale State Department reports that had mentioned problems under the prior administration with corruption in the judiciary and elsewhere in the system. That is insufficient as a matter of law. This court has repeatedly held in Teredi, in Base Metal, and in other cases that have been cited in our briefs that State Department vague briefings are insufficient basis on which this another court. It's not a position that this court typically wants to be in. I would like to go back, Your Honor. Excuse me, Mr. Ehrenstein. I thought that the arguments that were made with respect to adequacy of the form primarily related to the statute of limitations question. Isn't that what they were really hanging their hat on rather than some notion that the entire system there is somehow uncivilized or corrupt or not independent? Your Honor, it's been a bit of a moving target. It started out, the plaintiff's position started out as Angola is corrupt and we can't get a fair shake even though we've agreed to litigate there and even though we've been litigating there and we don't like the results, but now we realize we it morphed. Their argument morphed over time until after the arguments had been made and they said, oh, there's this unwaivable statute of limitations. Mr. Levy on the record said, I don't think so. That's not really, we don't know. That's not the case. Subsequently, there was additional testimony provided by declaration from the experts that established the red herring that this statute of limitations really is. The 180-day statute of limitations is a statute of limitations that does not apply to breach of contract claims against the government, number one. Number two, there was no date by which the statute, according to their own expert, was supposed to start running. We don't know when the date was triggered according to their analysis. Number three, the whole statute of limitations argument ignores the teachings of our case law, which say that the idea isn't that you have to be able to bring each and every same exact claim that you have here in the United States. It's only that you can get a fair hearing on these issues. Now, the plaintiffs have raised, I think, a total of nine or 10 claims that are related to the same thing, breaches of contract, wrongful expropriation, alleged wrongful expropriation. These are the gravamen of the complaint here. They are the essence of what they are already litigating over there and what they can continue to litigate over there. To answer your question about whether if Angola was to be asked the same question as GE, would we agree that we're subject to jurisdiction and that we would waive the statute of limitations, the answer is, of course, if that would be a condition imposed by this court, we would be happy to do so. I do want to point out one other, I think, distinguishing factor here, which is that the contracts that we have, Your Honor, Judge Cabranes, you have asked a very important question, which is, didn't they just include language in their contract that said, we'll go arbitrate in New York? They had every opportunity to do that. They entered into an arm's length bargain for negotiated position between freely contracting parties, and those parties agreed. They agreed that any dispute is going to be arbitrated in Luanda, not here in New York, and that tilts. That agreement has a huge effect on the forum non-convenience analysis. Refresh my recollection. Are all the plaintiff parties Angolan citizens? Both of them are. And both of them, there were 14 contracts that were signed. All of them have forum selection clauses providing for resolution in Angola, except for one which says Portugal. So we think that agreement tilts the forum non-convenience analysis hugely. There was the case Fasano, which we cited in our brief, Fasano versus you, where the court explained that the in favor of the contractually selected forum, and that presumption can be rebutted with evidence of fraud or overreaching. There has been no evidence of fraud or overreaching in these contracts. The plaintiffs are sitting here trying to enforce those contracts. They're trying to, and I apologize for that, they're trying to enforce those contracts in Angola. So the argument, I think, with respect to giving plaintiffs choice of forum, any deference at all evaporates completely. Thank you, Mr. Ehrenstein, very much. Thank you, sir. And Mr. Levy is ready to rebut, two words. Go ahead, Mr. Levy. Thank you so much. We've heard a lot, and I will try to be very brief. The first, our companies are treated as Portuguese under Angolan law. We're not treated as Angolan. We also have, under the FSIA, a judicial taking claim as to which we allege, as a jurisdictional fact, that we are Portuguese. Our evidence and... Why isn't it American law that would decide what is the citizenship of these countries for purposes of an American court deciding forum non-convenience? Well, it would be American law. We have an expropriation claim under this circuit decision in FAR. The court looks, as a matter of international law, to how the foreign country treats us. So if Angola treats us as Portuguese, then under FAR, that's how we should be treated for purposes of expropriation. For FNC... I thought they treated you as an Angolan corporation that is controlled by Portuguese shareholders. Well, there's a dispute on that, but our evidence is that we were treated as Portuguese. The court below... What does that mean, treated as? I'm not sure what you mean by that. Right. The court below, well, there's Angolan law saying that if we're majority owned by Portuguese, by a non-Angolan, we're treated as that nationality. Treated as that nationality for what purpose? For purposes of the investment law and for, I believe, other purposes. The point, though, is we allege... What other purposes? I understand the investment law. There may be particular regulations that apply, but what do you mean other purposes? What other purposes? I think for purposes of this analysis, we allege, as a part of our expropriation claim, that we are Portuguese. We're beyond allegations here. We're at the forum non-convenience. We're at the stage and putting in evidence regarding the FNC issue. Well, I understand. What I'm curious is, putting aside what you allege, what evidence have you put in besides the fact that for purposes of the investment law, there may be particular ways in which this Angolan corporation is treated, but what are the other ways in which the corporation is not treated as an Angolan corporation for purposes of this litigation? So, we put in evidence about the Turbine proceeding, in which we put in evidence that we were treated as non-Angolan and that we were subject to a judicially imposed expropriation. That is an allegation that should be assumed true at this stage. Haven't you just combined two issues? You said you were subjected to an expropriation. Right. What has that got to do with your not being treated as Angolan? A country can expropriate its own citizens, right? Right. But we've alleged as a matter of jurisdictional fact that there was a violation of international law. The court below assumed there was jurisdiction. And so, that jurisdictional fact must be presumed true for purposes of the analysis, because FNC only applies in those circumstances. The other point is, as a matter of the court's- In which circumstance, exactly? FNC applies, you say, applies in those circumstances. Right. Only when there is jurisdiction. So, either the court assumes that there is jurisdiction and then decides whether to dismiss for FNC or decides that there is, in fact, jurisdiction. And so, as we explain, in the circumstance when the court assumes jurisdiction under the FSIA, it should presume that the factual predicates for jurisdiction- I'm sorry. Are you assuming that your clients are non-U.S. citizens? My clients are not U.S. citizens. So, but it doesn't matter whether they're Portuguese or Angolan, right? So, that would be a matter of indifference for purposes of assuming subject matter jurisdiction under the FSIA, correct? No. Under the FSIA, they have to be non-Angolan if there is an expropriation claim. But for purposes of forum non-convenience, Mr. Levy, isn't the only relevance of the citizenship of anyone, whether this is a domestic or foreign plaintiff? And so, if they're Portuguese or they're Angolan, they're still not Americans or residents of New York bringing this claim. And therefore, their choice of forum gets less deference. Period. End of story. Now we move on to all the other issues. And the other issues have to do more with where are the witnesses, for example, than they have to do with what is their precise nationality. I think under the court's decision in NORACS, the court should consider what the plaintiff's home is because the question at step one is what is whether- It isn't New York. It isn't New York, right? That's right. It isn't the United States. It isn't anywhere in the United States. They're not United States citizens. They're not United States corporations. They're not New Yorkers. They're not from Connecticut. They are foreign to us. Yes? Yes, but the question at step one is whether it is more convenient than your home. And it matters to the analysis whether our home is Portugal or Angola, as we explained in our brief. But you may be treated poorly because of who owns the corporation. But as far as convenience is concerned, these are Angolan corporations. As far as I understand from the record, they are headquartered in Angola. They operate in Angola. These contracts were made in Angola. These contracts were for behavior in Angola. I'm having a little trouble understanding why the fact that they are owned by a Portuguese national has any impact on the relative convenience of litigating this case in New York or in Angola. The question, I think, is where the evidence and witnesses are of the plaintiff. And the record establishes without doubt that that's Portugal, not Angola. And so we are being forced by GE- How many witnesses are there that are in Portugal? The owner, is that right? No, there are over a dozen witnesses associated with the plaintiffs. All but one of them are in Portugal. We have maybe a handful in Angola. Portugal is by far the dominant location of our witnesses. And so we are being forced at GE's behest to go to Angola- Why is it GE's behest? At Angola's behest, right? As well as GE's. As the defendant's behest. GE has most of its witnesses here. Angola's are in Angola, but ours are in Portugal. Is there a reason why you didn't bring this lawsuit in Portugal, given what you've said? Well, we thought- It's not in the record, but we had questions about jurisdiction in Portugal as to everybody. The FSIA provides for jurisdiction here against Angola based on the contacts. There's a U.S. co-defendant, which has substantial witnesses and evidence here. It's a legitimate form under NOREX. How would you describe your concerns about litigation in the Republic of Angola? Obviously, I don't want to say that you have something against Angola or Angola. Have you been to Angola? I have not been to Angola personally. Have any of the lawyers in this action been to Angola, I wonder? Nobody I work with. And I don't believe my client's been to Angola in some time. What is the problem with Angola, exactly? Well, one, at this point, there is a non-liable statute of limitations. Two, there is a concern- This is all very abstract to my way of thinking. I think you have something. You and your clients are greatly concerned about getting justice in Angola, right? That's right. Why is that? There is critical evidence here, and there is an independent judiciary in the United States. We have a claim. We allege that there was a taking in violation of international law in Angola, that the Angolan judiciary participated in that expropriation. And as a matter of federal substantive law, there is a federal interest in the courts of this country hearing those claims. The FSIA was passed in 1976 to address those very concerns, including in instances where there are no connections at all to the United States that are related to the conduct. This court in FAR made exceedingly clear that Congress was addressing a widespread problem that the Nixon administration was addressing of expropriations and wanted to open the courts of this country and their independence to ensure that the rule of law would prevail. And that is why we sued here. It is also because GE is here. I thought the FSIA was all about codifying and reforming longstanding issues about when foreign sovereigns could be sued in the United States and turning this into a question of law to be adjudicated in the courts rather than a matter for State Department discretion. It is a comprehensive statute. I think you're starting to confuse this with something like the Alien Claims Act or the Torture Victims Statutes, which are where the cases that you actually cite sound. The cases that you cite for the proposition that the FSIA somehow trumps forum nonconvenience are actually cases about statutes that were specifically created to allow people to sue foreign governments in the United States that would otherwise be suing elsewhere. The FSIA is primarily concerned with suits by Americans against foreign countries for all kinds of reasons. So two points. First, one of the concerns is behind the FSIA was to have a uniform comprehensive scheme, which is why we say the analysis has to be different. But Congress, by opening the doors of the courts of this country, also reflected the federal policy. And that's set forth in Berlin. Has any court in the United States ever held that the FSIA, as a result of the FSIA, a suit brought under the FSIA cannot be subject to forum nonconvenience? There are a couple of district court decisions we cite in our brief, yes. But the point I'm making here is if the ordinary analysis applies, that policy interest has to be considered. And there is a policy interest in the United States adjudicating claims of expropriation. And that's reflecting the FSIA. And it's not just about the comprehensiveness of the scheme. The court's decision in FAR, which was decided before the FSIA and addressing the second Hickenlooper amendment, explained that the purpose of the FSIA, of the amendment, which was then brought into the FSIA, was to ensure that the United States markets would not be used as thieves markets for expropriate goods. And for that reason, the FSIA exception for expropriation, which is one that we invoke here, was written to apply not just when the expropriation has a connection here, but when the instrumentality that takes the property engages in commerce here. But Mr. Levy, in what sense is commerce in America or any financial interest in America involved in this lawsuit? Well, I think the first answer to the question is because it was assumed as a matter of jurisdiction that the FSIA would apply, that the analysis should proceed on that assumption. The interests that we allege are several fold. One, there's tortious conduct by GE to take over the contracts. Two, there was a massive payment in the United States in U.S. dollars, which is a hook for jurisdiction under the direct effects prong of the commercial activity exception. When Angola terminated the contracts, a payment that was meant to occur in the United States did not occur. That's enough to have jurisdiction under Justice Scalia's decision for the court in Weltover. And as for the expropriation, the entity that took the property, the turbines, is engaged in commercial activity in the United States. So there are multiple claims that we make below us to that. The important point for purposes of this court is that the court below assumed that was all true by assuming jurisdiction. And so for purposes of the analysis, we think it's inappropriate to say that this case has nothing to do with the United States when the FSIA is there to provide for jurisdiction in these very cases. Thank you very much, Mr. Levy. We thank all three counsel for a well-argued case. We will reserve decision and we thank you very much.